COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

JOSE AGUILERA,                                             )                  No. 08-04-00002-CR
)
                                    Appellant,                        )                              Appeal from
)
v.                                                                          )                  County Court at Law No. 1
)
THE STATE OF TEXAS,                                   )                  of El Paso County, Texas
)
                                    Appellee.                          )                  (TC# 20020C03681)

O P I N I O N

            Appellant appeals his conviction for driving while intoxicated. He was found guilty by a jury
and sentenced to one year in jail, probated for two years, and a $2,000 fine. The primary issue is
whether the evidence is factually sufficient to support the judgment. We affirm.
FACTUAL SUMMARY
            On February 23, 2002, after grabbing a bite to eat at Jack in the Box, Appellant spent his
evening at Graham Central Station, an El Paso nightclub. He drank four beers between 7 p.m. and
roughly 11:45 p.m. when he left the club. Appellant was tired since he was suffering with allergies
and he had not slept the previous two nights. On his way home, he dropped the remote control for
his radio. While trying to pick up the remote, Appellant lost control of his vehicle and hit the
guardrail of an overpass, causing damage to two of his tires and rims. Since it was a cold night, he
left the engine running so that the heater would be operational. He called for a tow truck and awaited
its arrival.
            Around 12:30 a.m., Officer Nicolas Varela received a dispatch regarding an accident on the
Interstate. As he approached, Varela saw a red truck with two flat tires parked in the right lane. He
also noticed damage to the rear right quarter panel of the truck. After activating his emergency
lights, Varela stepped out of his car and approached the truck. Appellant was revving the engine and
Varela did not believe that Appellant noticed him. Varela asked Appellant to step out of the truck. 
Appellant complied and Varela detected a strong odor of alcohol coming from his breath and person. 
Appellant’s eyes were red and bloodshot and his speech was slurred. Varela decided to conduct an
investigation and asked Appellant to perform the standardized field sobriety tests. Varela described
the road condition as smooth, the weather as calm, and the traffic as moderate. He ensured that the
patrol car lights were positioned so as not to interfere with the test. Nevertheless, there was
sufficient light for him to conduct the tests. 
            Having determined that Appellant had no injuries, had equal tracking pupil size, and was not
wearing glasses, Varela administered the horizontal gaze nystagmus test. He detected a lack of
smooth pursuit in both eyes. He observed clues for distinct nystagmus at maximum deviation and
for onset of nystagmus prior to 45 degrees on both eyes. Appellant demonstrated six out of six clues,
indicating intoxication. 
            Next, Varela administered the walk-and-turn test. Appellant demonstrated three clues
including making an improper turn, losing his balance while walking, and raising his arms for
balance. Finally, Appellant performed the one-leg-stand test. He hopped, placed his foot down
three times, and used his arms for balance. Varela was not aware of any disease or illness that would
have prevented Appellant from properly performing the test. Varela concluded that Appellant was
intoxicated and did not have the normal use of his mental or physical faculties.
            Officer Jose Torres was also dispatched to the accident scene that evening. When he arrived,
Varela had already completed the sobriety tests. Torres noticed a strong odor of alcohol on
Appellant’s breath and person, that his eyes were bloodshot, and that his speech was slurred. Torres
thought that Appellant showed poor balance while walking to the patrol car. Torres placed him
under arrest and transported him to the Central Regional Command Center. Varela remained at the
scene to await the tow truck. 
            At the station house, Appellant was asked to provide a breath sample. Torres explained that
a suspect is only asked to give a blood sample if he is not able to provide a breath sample and that
Appellant did not ask for one. Officer Otto Herrera, a certified intoxilyzer operator, assisted with
obtaining a breath sample. Herrera began his observation period at 1:40 a.m. During the
observation, he made notes and ensured that Appellant did not throw up, fall down, hurt himself,
have anything in his mouth, or need medical attention. 
            Herrera turned on the intoxilyer machine and it ran internal checks. Herrera entered personal
information including Appellant’s name, date of birth, Herrera’s operator number, and the arresting
agency. He attached the mouthpiece and the machine issued a prompt. Appellant was told to blow
with steady pressure for a specific amount of time until the machine was satisfied with the sample. 
After two samples were taken, the machine printed results of the tests. 
            Technical supervisor Socorro Castaneda explained that the national scientific community
accepts the intoxilyzer as a valid measure of alcohol concentration and intoxication. The machine
uses three wavelengths of infrared energy. Alcohol absorbs energy at a unique ratio compared to
other substances. Castaneda described how the machine worked using a diagram. The results of the
tests are stored in the machine so that officers cannot tamper with results. Since the modem is
external, a problem with it would not affect the accuracy of a breath sample. 
            Castaneda was responsible for maintaining the machine in operating condition. Calibration
checks at different alcohol levels were made onsite once a month. The interference detection system,
the internal standards, and channel and internal voltages were also checked. Computerized checks
were performed twice monthly. Appellant’s breath sample was performed in the early morning
hours of February 24. The last check had been conducted on February 21. It was checked again on
March 5 and Castaneda had found the machine to be in proper operating condition both times. 
Appellant’s first breath sample showed an alcohol concentration of 0.099. The second indicated a
concentration of 0.093. Castaneda opined that at a level of 0.08, a person is too impaired to safely
drive a motor vehicle. 
            Castaneda then discussed factors which could impact a determination of alcohol
concentration. If a person had a fever, the test would reflect a high level since there is a 6 percent
increase in alcohol concentration for every degree centigrade of body temperature. A burp would
not affect the results of the test but regurgitation might. However, that was the reason for the fifteen-minute observation period. Other substances will not interfere with the accuracy of the results
because the machine only measures ethyl alcohol. Condensation is not a problem since the breath
tube is warmed. The machine also has a trigger to invalidate a test if there is radio frequency
interference. The machine is only affected by temperatures above 80 degrees or cold winter
temperatures. Appellant’s breath samples were obtained indoors.
            Paul Goldstein testified as an expert for the defense on toxicology, the intoxilyer machine,
and field sobriety tests. He described the horizontal gaze nystagmus test, which, in his view, is
subject to numerous defects. There are twenty-five types of nystagmus, some of which are normal. 
One must have normal functioning eyes for the test to be effective. For example, a lazy eye or some
pathology of the eye will invalidate the test. Because a normal person has saccadic movement at an
extreme angle, police officers trained to conduct sobriety tests cannot differentiate between saccadic
movement and normal movement. This produces false positives. If the focus point is moved too
quickly, the eyes cannot track the object. This causes changes in the movement of the eyeball. Some
people cannot move their eyes to a maximum extent, which invalidates the test. It is also difficult
to estimate the forty-five degree angle necessary to conduct the test. Nystagmus can be seen at
intoxication levels below the legal limit, and 10 to 20 percent of the population has nystagmus when
sober or at a deviated maximum of 40 degrees. Medical conditions such as sinusitis, physiological
problems, brain problems, or the flu can affect test results. So can medications, caffeine, chills,
fatigue, fear, and anxiety. 
            Goldstein then discussed problems with the intoxilyer machine. First, temperature can affect
a reading. Second, there is a presumption that the subject is blowing breath out at 93 degrees
Fahrenheit, which is not always true. Third, the machine measures alcohol, not ethanol, and is
unable to differentiate between ethanol and menthol. The air blank is also a problem. While the
machine is designed to give error codes in the event of a problem, it only does so when the circuitry
is absolutely perfect. This cannot be verified since it can only be re-calibrated by the factory.             Next, Goldstein found fault with the coefficient used to calculate blood alcohol
concentration. The machine uses a coefficient of 2,300. Goldstein explained that each person is
different and may have a level between 1,000 and 3,000. This makes the readings inaccurate. The
machine also has at least a 10 percent chance of error. The machines cannot be tested by scientists
since no one outside of law enforcement has access. If a breath sample is close to the legal limit at
.08 or .09, then the uncertainties make it too close to call. 
            Appellant also testified as to the testing process. He agreed to perform the field sobriety tests
because he was not intoxicated. He disagreed that the road conditions were optimum, describing the
road as having gravel. He was wearing cowboy boots with roper heels. Appellant also told the jury
that a previous leg fracture affected his performance. Although Officer Varela had asked whether
he was injured, Appellant thought the officer meant, was he injured in the accident. He was cold,
shivering, and was not wearing a jacket. His allergies affected his breathing. He had an astigmatism
or a lazy eye. He was not told what to do on the walk-and-turn, nor was he told not to raise his arms. 
He claimed that during the test, he was standing on his bad leg, which caused him to lose balance. 
The officer was yelling at him, trying to intimidate him, and causing him to be nervous and upset. 
Appellant claimed that Varela told him he passed the sobriety tests; Torres told him it was 50/50. 
He agreed to provide a breath sample because he knew he was not drunk. He actually gave three
breath samples, not two, and that in between samples the officers were fiddling with the machine. 
Appellant was not told not to burp and he became dizzy after the third sample. 
MOTION FOR NEW TRIAL
            In Point of Error One, Appellant challenges the denial of his motion for new trial. He
complains the trial court made an improper comment to the jury panel concerning the punishment
range for a subsequent DWI. During voir dire, the trial court said:
And as I told you earlier, we are here on a criminal case. It is a DWI. Let me tell you
the range of punishment of a DWI, and then I will give you a brief introduction into
what is going to occur today.
 
DWI is a Class B misdemeanor, and the range of punishment is a fine up to $2,000
and jail time from three days to 180 days. If someone has previously been convicted
of DWI and then they get convicted of a second DWI, which is called DWI
subsequent, then the range of punishment is up to a $4,000 fine and jail time from 30
days to one year.
 
If a person is eligible for probation, then probation may be considered. And since
this is a criminal case, it’s going to proceed in two phases. The first phase, the jury
will decide whether Mr. Aguilera is guilty or not guilty. That is going to be your only
role.
 
If the defendant is found guilty, then I will do the sentencing. So, basically, your role
will be just to determine if a person is guilty or not guilty, and those are the two
phases that we have.

            Appellant maintains that the court committed fundamental error by informing the jury panel
that he was on trial for a subsequent DWI offense. He contends that the statement was unnecessary
since the degree of the offense was not a jurisdictional element. He explains that defense counsel
did not object because an objection would have alerted the panel and further exacerbated the error. 
            In order to preserve error for appellate review, the complaining party must make a timely,
specific objection and obtain a ruing on the objection. Tex.R.App.P. 33.1. In the absence of an
objection, exception or a request for an instruction or mistrial, an accused may not successfully assert
for the first time in a motion for new trial that reversible error occurred in reading to the jury prior
to the hearing on punishment the portion of an indictment alleging prior convictions for purposes
of enhancement only and not for jurisdictional purposes. See Cox v. Smith, 422 S.W.2d 929, 930
(Tex.Crim.App. 1968). Appellant has failed to preserve error by failing to object when the court
made the comment. Point of Error One is overruled. 
FACTUAL SUFFICIENCY
            In Point of Error Two, Appellant challenges the factual sufficiency of the evidence to support
the conviction. He argues that the field sobriety and intoxilyer tests were unreliable as evidence. 
Varela did not notice any balance problems but subsequent officers did, suggesting he was becoming
more intoxicated as time passed. He also argues that the gravel and lighting at the scene affected his
performance. Finally, he insists that his performance on the horizontal gaze nystagmus test was
affected by an astigmatism, allergies, fatigue, shivering, and fear, while a leg injury, fear and nerves
affected the walk-and-turn and one-leg-stand tests.
Standard of Review
            In reviewing factual sufficiency of the evidence to support a conviction, we are to view all
the evidence in a neutral light, favoring neither party. Johnson v. State, 23 S.W.3d 1, 7
(Tex.Crim.App. 2000); Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). Evidence is
factually insufficient if it is so weak that it would be clearly wrong and manifestly unjust to allow
the verdict to stand, or the finding of guilt is against the great weight and preponderance of the
available evidence. Johnson, 23 S.W.3d at 11. Therefore, the question we must consider in
conducting a factual sufficiency review is whether a neutral review of all the evidence, both for and
against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine
confidence in the fact finder’s determination, or the proof of guilt, although adequate if taken alone,
is greatly outweighed by contrary proof. See id. 
            In performing this review, we are to give due deference to the fact finder’s determinations. 
See id. at 8-9; Clewis, 922 S.W.2d at 136. The fact finder is the judge of the credibility of the
witnesses and may “believe all, some, or none of the testimony.” Chambers v. State, 805 S.W.2d
459, 461 (Tex.Crim.App. 1991). Consequently, we may find the evidence factually insufficient only
where necessary to prevent a manifest injustice from occurring. See Johnson, 23 S.W.3d at 12; Cain
v. State, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997).
            The Court of Criminal Appeals clarified this factual sufficiency standard in Zuniga v. State,
144 S.W.3d 477, 484 (Tex.Crim.App. 2004). There is only one question to be answered in a
factual-sufficiency review: Considering all of the evidence in a neutral light, was a jury rationally
justified in finding guilt beyond a reasonable doubt? The court found two ways in which the
evidence may be insufficient: (1) when considered by itself, evidence supporting the verdict may be
too weak to support the finding of guilt beyond a reasonable doubt, and (2) there may be both
evidence supporting the verdict and evidence contrary to the verdict. Id. at 485. Thus, balancing
all the evidence, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt
standard could not have been met and the guilty verdict should not stand. Id. This standard
acknowledges that evidence of guilt can “preponderate” in favor of conviction but still be insufficient
to prove the elements of the crime beyond a reasonable doubt. Id. Stated another way, evidence
supporting guilt can “outweigh” the contrary proof and still be factually insufficient under a
beyond-a-reasonable-doubt standard. Id. 
Driving While Intoxicated 
            A person commits the offense of driving while intoxicated if the person is intoxicated while
operating a motor vehicle in a public place. Tex.Pen.Code Ann. § 49.04(a)(Vernon 2003);
Tex.Pen.Code Ann. § 49.09(c)(Vernon Supp. 2004-05). The Texas Penal Code defines
“intoxication” as: (a) not having the normal use of mental or physical faculties by reason of the
introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or
more of those substances, or any other substance into the body; or (b) having an alcohol
concentration of 0.08 or more. Tex.Pen.Code Ann. § 49.01(2)(A)(B). 
            Appellant was charged with intoxication under both subparagraphs. Evidence of intoxication
may include (1) slurred speech, (2) bloodshot eyes, (3) the odor of alcohol on the person, (4) the odor
of alcohol on the breath, (5) unsteady balance, or (6) a staggered gait. See Cotton v. State, 686
S.W.2d 140, 143 n.3 (Tex.Crim.App. 1985). 
Intoxication
            Appellant challenges the finding of intoxication based on the field sobriety tests and the
intoxilyzer results. Here, upon arrival on the scene, Officer Varela observed that Appellant’s eyes
were bloodshot, his speech slurred, and his breath and person smelled of alcohol. Varela described
the condition of the road where the tests were performed as smooth and free from debris. On the
HGN test, Varela detected a lack of smooth pursuit and found clues for distinct nystagmus at
maximum deviation and prior to 45 degrees. Varela testified that the patrol car lights were behind
Appellant so as to not interfere with the test, that Appellant had no injuries, that he had equal
tracking and pupil size, and that he was not wearing glasses. 
            Varela was not aware of any disease or illness that would impair Appellant’s performance
of the tests. On the walk-and-turn test, Varela found three clues since Appellant improperly turned,
lost his balance, and raised his arms for balance. On the one leg stand, Appellant hopped, placed his
foot down three times, and again used his arms for balance. After administering the field sobriety
tests, Varela believed Appellant was intoxicated. When Appellant was taken to the station to give
a breath sample, he blew a 0.099 and 0.093. 
            The State’s expert testified that she was responsible for calibrating and maintaining the
intoxilyzer machine and that the machine was in proper working order at the time the sample was
given. Castaneda also explained various mechanisms that would not affect the operation of the
machine such as interference substances, radio frequency interference, and breath temperature.
            Appellant testified that the tests were compromised since he was cold and nervous, suffering
from fatigue and allergies, had a leg injury and astigmatism, the ground had debris, and he was
wearing cowboy boots. He claimed that he provided three breath samples, not two, and that the
officers tampered with the machine during the samples.
            The defense expert noted problems with the field sobriety tests. He claimed that the HGN
test was affected by Appellant’s astigmatism and that officers were not trained to properly
distinguish between different kinds of nystagmus. He cited sinus or allergy problems, being cold,
tired, and scared as affecting the results of the tests. Finally, he challenged whether the road and
lighting conditions were proper. As for the intoxilyzer, he admitted that the theory was proper but
he challenged the validity of the readings since there was no way to ascertain whether the machine
was working properly. He cited problems with temperature, the air blank, the coefficient used to
calculate blood alcohol levels, and re-calibration. He also complained that the intoxilyzer was not
available to scientists and thus could not be tested to ensure proper readings.
Conclusion
            We must give due deference to the fact finder’s determinations in our review of the evidence,
and as the judge of the credibility of the witnesses, the jury had the right to believe all, some, or none
of the testimony. We do not find the evidence to be so weak as to render the verdict against the great
weight and preponderance of the evidence or to be clearly wrong and unjust. Having found the
evidence sufficient, we overrule Point of Error Two. The judgment of the trial court is affirmed.


May 31, 2005                                                              
                                                                                    ANN CRAWFORD McCLURE, Justice
Before Barajas, C.J., McClure, and Chew, JJ.

(Do Not Publish)